1  Respond to: Carry Eugene: Shorthill & Her Royal Highness Princess Tina Rae:
   suae potestate esse et uxor Sui Juris
2  c/o hc34 box2134
   Wasilla
3  Alaska Territory
   republic united States of America
4
5                                          District Court for the United States
6                                                at Anchorage, Alaska
7
                                              3:07-CV-00193 RRB
8  Carry Eugene: Shorthill
   suae potestate esse Sui Juris &
9
   Tina Rae:
10 suae potestate esse Sui Juris
                Plaintiffs
11
                  V
12 James M. Conley, Individually;
   Christopher Roger Nelson, Individually;
13 Richard Dykstra, Individually;
   Samuel M. Flack, Individually;
14 Pablo Paiz, Individually;
   Shane Pollock, Individually;
15 John Kliensmith, Individually;
   Heinkman, Individually;
16 Nancy Reeder, Individually;
   Thomas Nelson, Individually;
17 Walter Monegan, Individually;
   Mark Begich, Individually;
18 Frederick Bones, Individually;
   Daniel Shorey, Individually;
19 Joyce Weaver-Johnson, Individually;
   Michael Wolverton, Individually;
20 Julia Dean Moudy, Individually;
   Reginald James Christie III, Individually;
21 Robert E Henderson, Individually;
   Sharon Marshall, Individually;
22 Daniel L Lowery, Individually;
   John B Skidmore, Individually;
23 John R Lohfft, Individually;
   Jack M Smith, Individually;
24 Leonard M Linton Jr., Individually;
   Suzanne Cole, Individually;
25 Sharon Gleason, Individually;
   Stephanie Rhoades, Individually;
26 Sigurd E Murphy, Individually;
   Alfred Andrew Peterson, Individually;
27 Erin White, Individually;
   Glen Daily, Individually;
28 Dennis Allen, Individually;

   Complaint

RECEIVED

SEP 26 2007

CLERK, U.S. DISTRICT COURT
ANCHORAGE, A.K.

1  Joe Masten, Individually;
   Myron Fanning, Individually;
2  Paul Honeman, Individually;
   Mark Thelen, Individually;
3  Miller, Individually;
   Audie Holloway, Individually;
4  Luanna Lee Greybear, Individually;
   Angela Williams, Individually;
5  Ane Whitlock, Individually;
   Jennifer Rego, Individually;
6  Patricia B Oscannell, Individually;
   Joyce Creed, Individually;
7  Robert Heun, Individually;
   Charles, Individually;
8  Chris Jones, Individually;
   Michael Abbott, Individually;
9  Jim Reeves, Individually;
   Joshua Freeman, Individually;
10 Larry Card, Individually;
   Andrew Grannik, Individually;
11 Mark Borneman, Individually;
   Sarah Palin, Individually;
12 Talis Colberg, Individually;
   More later;
13              Defendants          Case No.

14
                        **COMPLAINT**
15

16
                       **JURISDICTION**
17

18
    "And be it further enacted. That no summons, writ, declaration, return, process, judgment, or other
19 proceedings in civil cases in any of the courts or the United States, shall be abated, arrested, quashed
   or reversed, for any defect or want of form, but the said courts respectively shall proceed and give
20 judgment according as the right of the cause and matter in law shall appear unto them, without regarding
   any imperfections, defects or want of form in such writ, declaration, or other pleading, returns process,
21 judgment, or course of proceeding whatsoever, except those only in cases of demurrer, which the party
   demurring shall specially sit down and express together with his demurrer as the cause thereof. And
22 the said courts respectively shall and may, by virtue of this act, from time to time, amend all and every
   such imperfections, defects and wants of form, other than those only which the party demurring shall
23 express as aforesaid, and may at any, time, permit either of the parties to amend any defect in the
   process of pleadings upon such conditions as the said courts respectively shall in their discretion, and
24 by their rules prescribe"
           Judiciary Act of September 24, 1789, Section 342,
25              FIRST CONGRESS, Sess. 1, ch. 20, 1789

26
   U.S. Supreme Court
27 *U S v. LEE*, 106 U.S. 196 (1882)

28 No man in this country is so high that he is above the law. No officer of the law may set that law at

   Complaint                                              Page 2 of 23

1 defiance with impunity. All the officers of the government, from the highest to the lowest, are creatures
  of the law and are bound to obey it. It is the only supreme power in our system of government, and
2 every man who by accepting office participates in its functions is only the more strongly bound to
  submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the
3 authority which it gives.

4 Courts of justice are established, not only to decide upon the controverted rights of the citizens as
  against each other, but also upon rights in controversy between them and the government, and the
5 docket of this court is crowded with controversies of the latter class. Shall it be said, in the face of all
  this, and of the acknowledged right of the judiciary to decide in proper cases, statutes which have been
6 passed by both branches of congress and approved by the president to be unconstitutional, that the [106
  U.S. 196, 221] courts cannot give remedy when the citizen has been deprived of his property by force,
7 his estate seized and converted to the use of the government without any lawful authority, without any
  process of law, and without any compensation, because the president has ordered it and his officers are
8 in possession? If such be the law of this country, it sanctions a tyranny which has no existence in the
  monarchies of Europe, nor in any other government which has a just claim to well-regulated liberty and
9 the protection of personal rights.

10 U.S. Supreme Court
   KILBOURN v. THOMPSON, 103 U.S. 168 (1880)

11
   The powers of Congress itself, when acting through the concurrence of both branches, are dependent
12 solely on the Constitution. Such as are not conferred by that instrument, either expressly or by fair
   implication from what is granted, are 'reserved to the States respectively, or to the people.' Of course,
13 neither branch of Congress, when acting separately, can lawfully exercise more power than is conferred
   by the Constitution on the whole body, except in the few instances where authority is conferred on
14 either House separately, as in the case of impeachments. No general power of inflicting punishment by
   the Congress of the United States is found in that instrument. It contains in the provision that no 'person
15 shall be deprived of life, liberty, or property, without due process of law,' the strongest implication
   against punishment by order of the legislative body. It has been repeatedly decided by this court, and
16 by others of the highest authority, that this means a trial in which the rights of the party shall be decided
   by a tribunal appointed by law, which tribunal is to be governed by rules of law previously established.
17 An act of Congress which proposed to adjudge a man guilty of a crime and inflict the punishment,
   would be conceded by all thinking men to be unauthorized by anything in the Constitution.

18
   It is believed to be one of the chief merits of the American system of written constitutional law, that all
19 the powers intrusted to government, whether State or national, are divided into the three grand
   departments, the executive, the legislative, and the judicial. That the functions appropriate to each of
20 these branches of government shall be vested in a separate body of public servants, and that the
   perfection of the system requires that the lines which separate and divide these departments [103 U.S.
21 168, 191]  shall be broadly and clearly defined. It is also essential to the successful working of this
   system that the persons intrusted with power in any one of these branches shall not be permitted to
22 encroach upon the powers confided to the others, but that each shall by the law of its creation be limited
   to the exercise of the powers appropriate to its own department and no other. To these general
23 propositions there are in the Constitution of the United States some important exceptions. One of these
   is, that the President is so far made a part of the legislative power, that his assent is required to the
24 enactment of all statutes and resolutions of Congress.

25 In looking to the preamble and resolution under which the committee acted, before which Kilbourn
   refused to testify, we are of opinion that the House of Representatives not only exceeded the limit of
26 its own authority, but assumed a power which could only be properly exercised by another branch of
   the government, because it was in its nature clearly judicial.

27
   The Constitution declares that the judicial power of the United States shall be vested in one Supreme
28 Court, and in such inferior courts as the Congress may from time to time ordain and establish. If what

1   we have said of the division of the powers of the government among the three departments be sound,
    this is equivalent to a declaration that no judicial power is vested in the Congress or either branch of
2   it, save in the cases [103 U.S. 168, 193] specifically enumerated to which we have referred. If the
    investigation which the committee was directed to make was judicial in its character, and could only
3   be properly and successfully made by a court of justice, and if it related to a matter wherein relief or
    redress could be had only by a judicial proceeding, we do not, after what has been said, deem it
4   necessary to discuss the proposition that the power attempted to be exercised was one confided by the
    Constitution to the judicial and not to the legislative department of the government. We think it equally
5   clear that the power asserted is judicial and not legislative.

6   We are of opinion, for these reasons, that the resolution of the House of Representatives authorizing
    the investigation was in excess of the power conferred on that body by the Constitution; that the
7   committee, therefore, had no lawful authority to require Kilbourn to testify as a witness beyond what
    he voluntarily chose to tell; that the orders and resolutions of the House, and the warrant of the speaker,
8   under which Kilbourn was imprisoned, are, in like manner, void for want of jurisdiction in that body,
    and that his imprisonment was without any lawful authority.
9
    The tendency of modern decisions everywhere [103 U.S. 168, 198] is to the doctrine that the
10  jurisdiction of a court or other tribunal to render a judgment affecting individual rights, is always open
    to inquiry, when the judgment is relied on in any other proceeding. See Williams v. , Berry, 8 How. 495;
11  Thompson v. Whitman, 18 Wall. 457; Knowles v. The Gas- Light & Coke Co., 19 id. 58; Pennoyer v.
    Neff, 95 U.S. 714 .
12
    Neither originally nor by appeal can it decide a matter in litigation between two parties; it has no means
13  of doing so; it claims no such power; powers of inquiry and of accusation it has, but it decides nothing
    judicially, except where it is itself a party, in the case of contempts. . . . Considered merely as
14  resolutions or acts, I have yet to learn that this court is to be restrained by the dignity or the power of
    any body, however exalted, from fearlessly, though respectfully, examining their reasonableness and
15  justice, where the rights of third persons, in litigation before us, depend upon their validity.' Again, he
    says: 'Let me suppose, by way of illustration, an extreme case; the House of Commons resolves that any
16  one wearing a dress of a particular manufacture is guilty of a breach of privilege, and orders the arrest
    of such persons by the constable of the parish. An arrest is made and action brought, to which the order
17  of the House is pleaded as a justification . . . . In such a case as the one supposed, the plaintiff's counsel
    would insist on the distinction between power and privilege; and no lawyer can seriously doubt that it
18  exists: but the argument confounds them, and forbids us to enquire, in any particular case, whether it
    ranges under the one or the other. I can find no principle which sanctions this.'
19
    Especially is it competent and proper for this court to consider whether its proceedings are in conformity
20  with the Constitution and laws, because, living under a written constitution, no branch or department
    of the government is supreme; and it is the province and duty of the judicial department to determine
21  in cases regularly brought before them, whether the powers of any branch of the government, and even
    those of the legislature in the enactment of laws, have been exercised in conformity to the Constitution;
22  and if they have not, to treat their acts as null and void.

23
       It is hereby ordered that none of this information can be used against Carry in his state criminal
24  proceedings.
25
26
27
                                    CONLEY'S VIDEO 26 SEP 2005
28

    Complaint                                                                          Page 4 of 23

1. On 26 Sep 2005, at about 12:59:08, officer James M. Conley(Hereinafter Conley), was sitting on the Old Glen Highway off ramp exit in the wrong lane were if someone would have been getting off the road would have ran right into him head on. Conley was watching the traffic from the bridge there.

Then at about 12:59:33 Carry and Tina Shorthill come into the picture. We were driving a 1991 blue Mitsubishi. This truck belonged to James Shorthill. At 12:59:36 Conley starts rolling down the ramp. At 12:59:46 Conley finally gets on his side of the off ramp. Conley has all ready lost sight of Carry and Tina for more then 10 seconds. At 13:00:01 Conley almost runs a white truck off the road because Conley is driving his car through his camera.

At 13:00:16 Conley almost runs another red truck off the road. While still driving with his camera. Conley has not been in sight of Carry and Tina for 41:15 seconds. At 13:00:32 officer Christopher Roger Nelson(Hereinafter Nelson), passes us on the other side of the highway. Also at 13:00:33 Conley is trying to run another white truck off the road. At 13:00:49 Carry changes lanes and we are now in front of Conley who is on the cell phone to Nelson.

Carry and Tina had a run in with Nelson on 13 Feb 2005. Nelson stole our car at gun point. And Conley knew who we were too. Because Conley had seen us on 6 May 2005 at a evidentiary hearing Conley was attending. So this was all done in retaliation because we had gone to the FBI and to internal affairs. Carry had to go to the FBI to report is medication being stolen by Nelson. The FBI told us that the next time we get an unmarked car behind us, to call 911 and tell them we are not eluding. That we are going to a safe, open public place were we will talk.

Conley and Nelson use their cell phones a lot. At 13:01:08 Carry sees the unmarked car behind us. He says to Tina; I think we have an unmarked car behind us. This just doesn't seem right, get the camera out. Tina gets the camera and Carry gets on the cell phone to 911. Carry tells 911 that we are not eluding, that we are going to a safe, open public place were we will talk to the cop. 911 can't find any officer out in the area where we are at for over 3 minutes. This is making Carry and Tina wonder just who do we have behind us?

Anchorage Police Department(hereinafter APD), has over 500 missing uniforms complete with badges and guns. And APD's Response/Resistance says; that an officers presence in uniform his

1   his/her first show of force. And that they will use up to and including deadly force to get you to
2   submit to them. Carry and Tina were in fear for their lives.   We are exposing them for what they
3   really are, a para-military organization being used against the people. It was nothing more than
4   retaliation for our demands for redress concerning February 13, 2005 incident.

5      Conley had already turned his lights off before pulling in behind us and cutting off another car at
6   about 13:01:24. At 13:01:26 Conley is required to call in the plates and let dispatch know where he
7   is. Conley doesn't do this for a while yet. Conley is also talking to Nelson on his cell phone. At
8   13:01:33 Conley pulls over to the side of the road. We have our right turn signal on because we
9   don't know where the flashers are. This is not our truck. At 13:01:45 we are coming up on the
10  Eklutna bridge. We are still on the phone with 911. At this point, is where 911 tells us that they
11  can't find any officers in the area.  This is very alarming!

12     At 13:02:10 Conley zooms his camera in so you can't see how close he really is to our truck.
13  Conley appears several times to make an attempt to strike the rear end of our pick-up.  At 13:02:30
14  Tina finally is able to get the camera out.  At this point, Conley is telling Nelson what Carry looks
15  like. Carry is telling Conley; "I'm going to a safe place, follow me."  We also told 911 that we are
16  going about 30mph. So, we were not speeding.

17     At 13:03:00 Carry gets back on the phone with 911, to no avail.  At 13:03:09 Conley tries to hit
18  us again.  At 13:03:40 Conley is on his cell phone with Nelson. At 13:04:36 Conley is still talking
19  with Nelson trying to figure out how they can kill us. Hnjm We are about 1 mile from the Mirror
20  Lake exit.  At 13:05:10 Conley comes back up on us like he is trying to hit us again. We figure that
21  Nelson has joined in at this point. Conley is still talking with Nelson trying to figure out how they
22  can kill us.  Conley and Nelson are both in unmarked cars.

23     At 13:06:14 Conley moves his car over so that you can't see Nelson coming up from behind him.
24  At 13:06:21 Nelson comes from behind Conley and gets in front of Carry without any emergency
25  equipment operating and puts on his brakes and then engages emergency lights trying to get Carry to
26  hit him. On the channel 1 tape, Nelson says; he doesn't care if Carry hits him or not. Now, if these
27  cops are suppose to be afraid for their lives, why in Gods name would they be doing something this
28  stupid?  This is at the Mirror Lake exit, where Nelson nearly stops in front of Carry.

Complaint                                                                                    Page 6 of 23

1    At 13:06:25 Carry goes around Nelson. At 13:06:28 Carry drives past and re-enters his prior
2  lane of travel. No attempt to run Nelson off the road. No swerving toward Nelson on his first
3  attempt to pass as Nelson and Conley's perjured testimony before the grand jury implicates. At
4  13:06:33 Nelson goes around Carry on up to the next turn off. At 13:06:49 Nelson passes a car and
5  stops sideways right in front of this car, scaring the civilian driver of this car. This car does pull off
6  the road at north peters creek exit. At 13:07:03 Carry can see that the other cop is up front of us
7  sideways in the road doing something. At 13:07:09 Carry is afraid for his life and for his wife's life.
8  At 13:07:14 Carry buts the brakes on. Carry is all ready going slow. At 13:07:19 Carry buts the
9  brakes on again. At 13:07:21 Nelson is using the spike strip. The only problem is that he was NOT
10  authorized by ANYONE to use them!!!!!!!  This was the second attempted murder by Conley and
11  Nelson. At 13:07:22 Nelson was unsuccessful in his attempt to destroy private property without
12  cause or need.

13    At 13:07:24 Carry and Conley both get around the spike strips. Nelson is really pissed off at this
14  point. Because for the second time now, Carry has made on ass out of him in front of his fellow
15  officers. Carry always establishes a Constitutional seizure. By asking, Am I under arrest?; Am I free
16  to go?; I am in fear for my life.; I am invoking my 5th Amendment right not to give evidence against
17  myself, and my 6th Amendment right to assistance of counsel.

18    At 13:07:26 Carry is scared for his life and for his wife's life to. He is going to be doing what he
19  can to protect us. At 13:07:42 Conley tries to passes us. Conley is on the radio with 911 trying to
20  see if someone else has spike strips. Officer Samuel M. Flack(hereby Flack) doesn't have any.
21  Officer Richard Dykstra (Dykstra) has feloniously driven at 105mph passing 40 plus to get behind
22  us keeping the other cars from getting in the way. See Dykstra's video. At 13:08:22 this is the
23  civilian that Nelson ran off the road in his unauthorized preparation to deploy the spike strip.

24    At 13:08:31 Conley refocuses his camera again. At 13:08:35 Nelson comes up on Carry. At
25  13:08:49 Conley goes around Carry. At this point, Conley perjured himself before the grand jury by
26  telling them that he was in fear for his life. That Carry tired to run him off the road right here. And
27  Nelson has a drug problem or a serious ethically deficiant issue, because he stole Carry's medication
28  from our car on 13 Feb 2005. At 13:08:52 Conley starts applying his brakes and then gets right in

Complaint                                                                Page 7 of 23

1   front of Carry trying to get Carry to hit him. At this point, Carry is going about 45/55mph.

2     At 13:09:00 Carry was able to avoid hitting Conley. At 13:09:03 Conley had to get into his own
3   lane. Conley and Nelson are in no way shape or form in fear for their lives. They are on a steroid
4   high. They are loving the thrill of the chase. At 13:09:11 Conley all ready knows who Carry is. We
5   are getting off at Peters Creek. Carry is heading towards the Chevron station in Peters Creek. That
6   has always been our safe, open public place. In fact, that is the first safe, open public place that you
7   come to.

8     At 13:09:32 Conley fixes his camera. At the bottom of the off ramp, Carry never hits the guy.
9   Carry saw the guy coming and allowed for that. Carry is not stupid like the cops think he is. At
10  13:09:39 this is were Conley says to dispatch that Carry almost causes a wreck. At 13:09:52 Conley
11  can't even make the left turn. He is off the road here. At 13:09:57 Conley gets a message that there
12  is a permit holder. Kind of a serious violation of procedure that Conley has no voice on this video
13  still. At 13:10:20 Conley is talking to Dykstra who got right behind him has we were coming down
14  the off ramp. Conley is telling Dykstra that; we have had trouble with this guy before, I recognized
15  the look on his face. Yet, Conley perjured himself to the grand jury when he told them that he did
16  not know who Carry was until after he arrested Carry.

17    At 13:10:21 Dykstra is trying to run Carry off the road. But Carry all ready knew he was turning
18  into the Chevron station. At 13:10:27 it shows Dykstra going right up to the side of the pumps.
19  Carry turns towards the door of the station. At 13:10:30 Carry is stopped and is screaming for help
20  a long with Tina. Carry and Tina were also on the phone with their friend Ronald Huckstep.

21    Tina is able to get through to Ron but all Ron can hear is our screaming for help. And dispatch
22  was also trying to get through to us because of Sgt. Paiz (X-4) told dispatch to call us back and tell
23  us to pull over. Tina also took over control of the phone during the chase on the highway. But 911
24  was being stupid. Tina was talking with Lt. Nancy Reeder. We have Reeder on video telling us that
25  APD doesn't need search warrants. We also have Lt Paul Honeman on video saying that
26  Anchorage's muni code is superior to our Constitutional rights. These two statements tells us that
27  APD does not follow their Operating Procedures Manual as is required by Law.

28    At 13:10:37 Conley is out of his car and at the drivers door with his gun pointing at Carry's head.

1  At NO time here did any of these officers ever identify themselves. Nor did they ask us to exit the
2  truck. At 13:10:41 Nelson shows up. At 13:10:43 Dykstra shows up and brakes out the drivers
3  window for NO reason. And these officers still never identified themselves or ask us to exit the
4  truck. Carry and Tina are still screaming at the top of our lungs. And we are trying to get Ron on the
5  phone again. All Ron can hear is our screaming. Ron has no idea where we are at this point.

6  At 13:10:52 Dykstra and Nelson are trying to get Carry out of the truck. We do have a right to
7  refuse the unlawful acts of the cops. At 13:11:02 Conley is pissed off that Tina has her door locked.
8  At 13:11:09 Conley and Nelson have their guns drawn at Carry and Tina. Just for the record, Tina
9  has diplomatic immunity. Judge Wolverton has honored her true identity. At 13:11:12 Conley puts
10  his gun in his left hand and picks up Dykstra's baton in his right hand. At 13:11:15 Conley uses an
11  over head swing to brake out the passenger window. Tina looked out her window in the mirror and
12  saw St. Paiz standing in front of Nelson's car. St. Paiz was watching Conley trying to kill Tina with
13  his over head swing. By Tina seeing St. Paiz in the mirror, is the only reason Tina is a live today to
14  talk about it now. Conley wanted us dead!!!!! Conley broke every rule in the book by using this
15  illegal swing at the window. Conley still has is gun in his left hand. Conley hit the window so hard
16  that James Shorthill is now going to have to buy a new door for the truck.

17  At 13:11:18 Conley is pulling Tina from the truck. At 13:11:19 Conley has his gun shoved into
18  Tina's back really hard. Conley wants to shoot Tina really bad so that he can get Carry to react so he
19  can shoot Carry to. These cops are way out of line here. At this point, Tina has her purse, cell phone,
20  and the camera with the disc inside the camera in her hands!!! Conley then throws Tina on the hood
21  of Nelson's car. At 13:11:24, Dykstra and Nelson pull Carry out and throw him to the ground
22  hurting him. One of these men also put his knee into Carry's chest and was trying to kill him by
23  choking him to death. These men were also putting the handcuffs on Carry to tight so that his hands
24  would brake at the wrist's. Also at 13:11:27 Conley is now with Tina on Nelson's hood. Conley is
25  trying to brake Tina's wrist's by forcing her to let go of her purse, cell phone, and camera with the
26  disc still inside the camera. Conley at this point, stole Tina's camera and disc inside the camera, the
27  sks riffle, the box of bullets, and the old timer knife.

28  At this point, 13:11:27 if you look at the window of the store, you will see Tina being sexually

Complaint                                                                    Page 9 of 23

1 assaulted by Conley. Conley was rubbing his privates on Tina's buttocks. Federal law 18 USC 2246
2 says as follows: the term "sexual contact" means the intentional touching, either directly or through
3 the clothing, of the genitalia, anus, groin, breast, inner thigh or buttocks of any person with an intent
4 to abuse, humiliate, harass, degrade, or arose or gratify the sexual desire of any person. Also in the
5 same law: the term "serious bodily injury" means bodily injury that involves a substantial risk of
6 death, unconsciousness, extreme physical pain, protracted and obvious disfigurement, or protracted
7 loss or impairment of the function of a bodily member, organ, or mental faculty.

8    At 13:12:11 Conley has Tina in handcuffs, and Dykstra and Nelson have Carry in handcuffs to.
9 At 13:12:13 Conley shoves Tina to the ground hurting her. Tina also had broken glass from the
10 window in her shoe that no one cared about weather she cut her foot up or not.

11    At 13:12:15 Conley helps Dykstra and Nelson with Carry. Conley was beating Carry at this point.
12    At 13:12:22 Tina is telling these cops NOT to hurt our backs and necks. That we had been hurt in
13 a car accident and our necks and backs were still hurt. This did nothing to stop Carry from being
14 beat on. Conley also was threatening Tina by trying to smash her face into the ground. At this point,
15 the cops were trying very hard to kill Carry by choking him.                 At 13:12:27
16 Samuel M. Flack shows up. Flack took over Tina. See in the video how crazy Flack is acting. He
17 really wants to shoot Tina. At NO point did these cops ever read Carry and Tina their Miranda
18 rights. How convenient it is that there is no sound on the video right now????

19    At 13:12:43 Conley and Nelson get up and are walking away.                     At
20 13:12:48 Nelson is in his car turning off the lights so that his camera will stop recording.
21 Tampering with evidence. At 13:13:01 Nelson does an illegal search of the truck, **search one**. At
22 13:12:46 Conley is asking dispatch if X4 is still on his way? X4 is St. Pablo Paiz. At 13:13:06
23 Nelson comes out of our truck with the SKS riffle. At 13:13:14 Dykstra does an illegal search of the
24 truck, **search two**. At 13:13:30 the sound comes on, the video. At 13:13:47 Carry his telling the
25 cops that he can't breath. At 13:14:03 Conley does an illegal search of the truck, **search three**. At
26 13:14:49 Flack takes Tina over to his car were he sexually assaults her by touch her pussy. At
27 13:14:45 Conley asks if X4 is still coming? At 13:15:14 ; 13:14:24 Nelson comes out of the truck
28 with the old timer knife and the box of bullets. This was an illegal search of the truck, **search four**.

Complaint                                                       Page 10 of 23

1 At 13:15:53 Nelson is back doing another illegal search of the truck, **search five**. The pictures taken
2 by Flack show how all of these illegal searches left the truck in a mess. These cops just thrashed the
3 truck doing their illegal searches. They can not thrash your truck like this.     At 13:16:21 Conley
4 says turn your recorder off. At 13:16:36 the recorder comes back on.

5    At 13:16:42 Carry is telling Conley that he told dispatch to tell you that I am going to a safe open
6 public place. That you people scare the fuck out of me. Because you have a use of force that says
7 you will use up to and including deadly force to get me to submit to you. Conley finally buts Carry
8 under arrest at 13:17:18 after Carry says that he has a right to go to a safe open public place before
9 he stops. In fact, the FBI Charles told us to go to a safe place next time we got an unmarked car
10 behind us. And that it is our right to go to a safe place before we stop. We have the right to make
11 sure who it is behind us before we stop.

12    Carry and Tina were still not given their Miranda rights at this point either. Carry is sitting over
13 by Conley's car. Since Tina was not under arrest, all of the items were required to have been given
14 back to her. At 13:18:30 the recorder goes off again. No more sound for this video. Tampering with
15 evidence. The cops didn't want any of the things that Carry was saying at this time to be recorded.
16 That violates their Operating Procedures Manual. At 13:20:30 the recorder comes back on again. At
17 13:21:28 Flack is asking if they want him to take pictures? Conley says yes, he wants pictures. By
18 this point, Flack had already sexually assaulted Tina. By touching her pussy with his hand, while
19 trying to get her to respond so that they could shoot her and get Carry to respond so that they could
20 shoot him to. The only thing was that Tina didn't respond to Flack's sexual assault because the Lord
21 told me that it would be ok. At 13:21:56 Conley says we know who he is already. They never ever
22 identify Tina. At 13:22:01 Conley says; X4 go to channel 4. And the recorder goes off again.
23 Questioning Carry without his Miranda rights and his assistance of counsel there, are major
24 violations of Miranda. And is an automatic summary judgement. ALL statements made by Carry
25 are not admissible in court.

26                              DYKSTRA'S VIDEO 26 SEP 2005

27    At 13:04:54 shows Dykstra passing us going North bound towards Wasilla. We are on the left
28 hand side of the scene. The only thing is, that this does not show up on Conley's video any where.

Complaint                                                                    Page 11 of 23

1 The white truck that Dykstra passes isn't in Conley's video. So where was Dykstra really at, at this
2 time??? Dykstra knows for sure. Because he was the one who played with this video. More evidence
3 being played with. Dykstra is not doing a low speed chase. He is going to be going around 109mph.
4 At 13:05:13 Dykstra's mic comes on. At 13:06:28 Dykstra puts on his lights and siren.

5   At 13:06:32 you can hear Conley telling dispatch that this guy doesn't seem to want to stop. He
6 is looking back making faces. At 13:06:55 Conley is saying that this guy is getting his video camera
7 going. He is not yielding. Carry was already on the phone with dispatch telling them that we are
8 going to a safe, open public place were we will talk with this guy. This message never made it to
9 Conley. At 13:07:15 Dykstra takes off from his stop. Conley is telling Nelson to set up his spike
10 strips at Mirror Lake. This took place after Nelson tried to get us to ram him.

11   At 13:07:42 Dykstra is now going to go as fast as he can to catch up to us. At 13:07:50 you can
12 hear Dykstra putting his foot into the gas petal. Dykstra is flooring it. Dykstra goes about 104mph to
13 catch up to us in about 4 minutes.  It took 4:38 minutes for Dykstra to pass 39 cars and trucks in
14 order to catch us.

15   At 13:09:21 Conley is saying that he will try to get ahead of him.  At 13:09:26 Conley says I don't
16 think he's gon'a ram ya!!!  At 13:06:55 Conley says; go to Mirror Lake and deploy the spike strips
17 to Nelson. At 13:10:32 Conley says that T57 is getting ready to deploy the spike strips.  At 13:10:55
18 someone asks what is the description of the vehicle?  At 13:11:03 Conley calls in the description of
19 the vehicle. At 13:11:05 dispatch says address out of Chugiak.  At 13:11:20 Conley says we are
20 30mph here maybe he is just trying to go home.  At 13:11:31 Conley says hold back the traffic back
21 there. We will try to spike him again.  At 13:11:58 Flack joins in and Conley says wait at North
22 Birchwood. Wait for the traffic to go by and spike him again if you have spikes. At 13:12:01 Flack
23 says I don't have spikes.  At 13:12:07 dispatch see if you can get him back on the phone and tell him
24 to pull over and stop.  At 13:12:04 Nelson was way over on the left shoulder. Carry did not push
25 Nelson there. Nelson got there on his own. At 13:12:09 Conley got around us and put on his brakes
26 trying to get us to rear end him. We got around him.  At 13:12:43 Nelson was sideways in the road
27 at this point. NOT going straight like Dykstra's video shows. Order Nelson to produce his video or
28 charge him with two(2) class c felonies for tampering with evidence.

Complaint                                                                           Page 12 of 23

1     At 13:12:43 Carry gets off the road at Peters Creek. Carry did not run anybody off the road. At
2  13:13:11 Conley was off the road here. Yet Dykstra's video shows him not off the road much.
3  Flack is asking which way did you guys go??? At 13:13:18 dispatch says; be advised, you have a
4  permit holder. At 13:13:38 Conley says; this guys been a problem before, I recognized his face. At
5  13:13:47 Dykstra is trying to show that he went right to the pumps. This is not so. Because in
6  Conley's video it shows Dykstra going along side the pumps right here. One of these videos has
7  been played with. Tampering with evidence.

8     At 13:13:50 you can hear us screaming for help and honking our horn. Conley says brake the
9  window out. At NO time did the cops ever ask us to leave the truck. Or identify themselves. At
10  13:14:03 you can hear Dykstra braking out the drivers window. Carry is scared out of his whits. I
11  have never seen Carry so scared before. Our friend Ron Huckstep could only hear our screams at
12  this point. He had NO idea on whether we were dead or alive or dying. At 13:14:20 you can hear
13  someone say riffle. At 13:14:20 you can hear Tina screaming for help. At 13:14:49 you can hear
14  someone say keep that on him. Carry is being hurt by these cops. At 13:15:01 the cops are trying to
15  break Carry's arms. At 13:15:24 Carry is screaming that he can't put his arms behind him or they
16  will brake is arms. At 13:15:40 Carry is asking for someone to help. At 13:16:05 Carry says he can't
17  breath.[Dykstra is kneeling on Carry's shoulder crushing Carry's chest] At 13:16:12 Flack just got
18  there. That was Nelson's siren. At 13:17:15 they let Carry sit up so he can breath. At 13:19:14
19  Dykstra moves his car and turns off his lights so his camera will stop recording. Tampering with
20  evidence. At 13:19:26 Carry says that the cuff on his right hand is cutting off his circulation. At
21  13:19:27 Sgt. Paiz says just wait a few minutes and we will loosen up the cuffs. Carry says it won't
22  matter then.

23     Back to Conley's video at 13:10:27 Dykstra pulls up past the pumps not right in front of the
24  pumps like it shows in his video. Dykstra's video has been played with a lot. Because they couldn't
25  play with Conley's video because Carry had saw it.

26     This whole chase of 26 Sep 2005, was in retaliation for 13 Feb 2005. On 13 Feb 2005, we were
27  recording some offers making a stop. We left and out of NO were officer Nelson came like a bat out
28  of hell with NO lights on, no nothing. He stole my car at gun point, and took things out of my car

Complaint                                                            Page 13 of 23

1 that are to this day, still missing. And my car was not taken to the impound yard like it was suppose
2 to. My car didn't show up at the impound yard until I was put on a car chase while they brought my
3 car to the impound yard. To this day, we have NO idea as to what APD was doing with my car.

4 And these cops are also playing in RICO, hate crime, attempted murder, sexual assault, assault
5 and battery, murder for hire, tampering with evidence, perjury, grand jury tampering, etc. this was
6 nothing more than a hate crime. Because these officers call us those constitutionalists. See the
7 internal affairs reports and APD's OPM and watch the video attached. Steeling private property
8 without search warrants. Lying in order to get illegally issued search warrants. Obtaining search
9 warrants 24 days after the property was stolen.

10 One day in court, Judge Michael Wolverton said out of the clear blue sky, you will have a trail by
11 jury. We had not said anything about that yet. So, we found out that Wolverton had a tap put on our
12 phone. Just the night before, we were talking with a friend about making sure Carry gets a trail by
13 jury. And then on 23 Mar 2007, we were having trouble with our phone as usual just before court.
14 So we talked with MTA and in about one hour, our problems with the phone were gone. Which
15 meant that the tap was gone. We have not had any more trouble with the phone since. Why did the
16 judge put a tap on our phone? How many other phones of the accused has Judge Wolverton tapped?
17 Present and past? We are sure that the DA's are involved to.

18 Issuing invalid, illegal subpoenas without there being the money to appear. And the documents
19 are also invalid because the new subpoenas with the new court clerks name had not been issued by
20 the court yet, as of 23 Oct 2006. Failure to give Miranda rights. Search's being done without search
21 warrants. This is conduct that shocks the conscious.

22 This became a hate crime because Conley and Nelson both knew us, knew who we were. And
23 their own OPM(operating procedure manual) prohibits them from even engaging us. When they
24 know who you are, they are required to back off and send you a ticket in the mail. And because they
25 are in unmarked cars, makes it even worse. Just last Dec 2006, Anchorage had two people posing as
26 cops and were raping and injuring people in Anchorage. **These officers wanted us dead!!!!**

27 This is conduct that shocks the conscious. And there is malicious prosecution with fabricated
28 evidence. The court or DA's have NO first hand knowledge or probable cause. Without probable

Complaint

1  cause, you have NO case. And the Major Begich is the one who put the hit out on us. And the is also

2  a retaliatory case. This 26 Sep 2005 was nothing more then retaliatory for the 13 Feb 2005 illegal

3  stop by APD.

4     And the judge Card allowed a sexually assaulted victim to be harassed by her perpetrator in his

5  courtroom and then he comes out and threatens to put her in jail. What ever happen to the rights of

6  the victims to NOT be harassed by their perpetrators? And when do the perpetrators go to jail? Just

7  because they are cops does not make it right for them to be out there doing this everyday.

8

9

10  § 1-1.163  Seizures, Consent
       There is no case in which a court has found a police-citizen exchange to be consensual where the citizen
11  unequivocally expressed his or her desire to be left alone.

12  AUTHORITY
       Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); Morgan v. Woessner, 975
13  F.2d 629 (9th Cir.1992) (withdrawn).
     § 1-1.174  Seizures, Retaliation
14
       The Fourth Amendment right to be free from arrests without probable cause is clearly established. Probable
15  cause is obviously lacking when the arrest is motivated purely by a desire to retaliate against a person who verbally
     challenges the authority to effect a seizure or arrest.
16
       The freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one
17  of the principal characteristics by which we distinguish a free nation from a police state.

18  AUTHORITY
       Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir.1994); Houston v. Hill, 482 U.S. 451, 462-63, 107 S.Ct.
19  2502, 2510, 96 L.Ed.2d 398 (1987).
     § 1-1.191  Fourth Amendment Rights Clothe Citizens
20
       Each citizen is clothed with constitutional protection against an unreasonable search or an unreasonable seizure.
21
     AUTHORITY
22       Ybarra v. Illinois, 444 U.S. 85, 91, 100 S.Ct. 338, 342, 62 L.Ed.2d 238 (1979).
     **§ 1-2.110  Searches, Retaliatory**
23
       **The Fourth Amendment right to be free from searches without probable cause is clearly established.**
24  **Probable cause is obviously lacking when the search is motivated purely by a desire to retaliate against a person**
     **who verbally challenges the authority to effect a seizure or search.**
25
       **The freedom of individuals verbally to oppose or challenge police action without thereby risking search**
26  **is one of the principal characteristics by which we distinguish a free nation from a police state.**

27  **AUTHORITY**
       **Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir.1994); Houston v. Hill, 482 U.S. 451, 462-63, 107**
28  **S.Ct. 2502, 2510, 96 L.Ed.2d 398 (1987).**

     Complaint                                                                    Page 15 of 23

1 § 1-2.124 Retention Of Seized Property

2     Failure timely to return seized property, which is without evidentiary value and which is not subject to forfeiture, is a basis for a Section 1983 claim.

3

AUTHORITY
4     Davis v. Gracey, 111 F.3d 1472, 1477 (10th Cir.1997) (citing F.R. Crim. P. 41 advisory committee note to 1989 Amendment); In re Search of Kitty's East, 905 F.2d 1367, 1375 (10th Cir.1990).
5 § 1-2.125 Notice Required When Property Seized

6     When police seize property, it is required that they provide notice that is reasonably calculated to inform people of the means by which they may be able to secure the prompt return of their seized property.

7

    Such notice should include: the fact of the search, its date, and the searching agency; the date of the
8 warrant, the issuing judge, and the court in which she or he serves; the persons to be contacted for further information; the procedure for contesting the seizure or retention of property taken, along with any additional
9 information required for initiating that procedure in the appropriate court; the search warrant number, or, if it is not available or the record is sealed, the means of identifying the court file; and, an explanation of the need for
10 a written motion or request to the court stating why the property should be returned.

11 AUTHORITY
    Perkins v. City of West Covina, 113 F.3d 1004, 1013 (9th Cir.1997); see also, Aguchak v. Montgomery
12 Ward Co., 520 P.2d 1352, 1357 (Alaska 1974).
§ 1-3.33.1 Force, Inappropriate Touching Constitutes Impermissible Force
13

    Non-consensual, inappropriate touching may violate the Fourth Amendment.
14

AUTHORITY
15     Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir. 2001).
§ 1-3.35.1 Force, Provocation theory: If Police Conduct Causes Others To Use Force To Which Police Respond,
16 Police May Be Held Liable For Use Of Force

17     When a police officer intentionally or recklessly provokes a violent confrontation, if the provocation is an independent Fourth Amendment violation, the officer then may be held liable for an otherwise defensive use
18 of force.

19     Thus, even when a police officer reasonably might fire back in self-defense, the officer still could be held liable for using excessive force because her or his reckless and unconstitutional provocation created the need to
20 use force.

21     The basis of liability for the officer's subsequent use of force is the initial constitutional violation.

22 AUTHORITY
    Billington v. Smith, 292 F.3d 1177, 1189-90 (9th Cir. 2002)(relying on Alexander v. City and County of
23 San Francisco, 29 F.3d 1355 (9th Cir. 1994), and Duran v. City of Maywood, 221 F.3d 1127 (9th Cir. 2000)).
§ 1-3.67 Force, Drawing Weapons May Violate Fourth Amendment
24

    Drawing weapons by police may be unreasonable, in violation of the Fourth Amendment.
25

AUTHORITY
26     Robinson v. Solano County, 278 F.3d 1007, 1015 (9th Cir.2002)(en banc); see, e.g., United States v. Del Vizo,
918 F.2d 821, 825 (9th Cir.1990); Washington v. Lambert, 98 F.3d 1181, 1187 (9th Cir.1996); Mellott v. Heemer, 161
27 F.3d 117, 123 (3d Cir.1998), cert. denied 526 U.S. 1160, 119 S.Ct. 2051, 144 L.Ed.2d 217 (1999); Petta v. Rivera, 143
F.3d 895, 897 (5th Cir.1998); Baker v. Monroe Township, 50 F.3d 1186, 1193 (3d Cir.1995)(collecting cases);
28 McDonald v. Haskins, 966 F.2d 292 (7th Cir. 1992); McKenzie v. Lamb, 738 F.2d 1005, 1010 (9th Cir. 1984); Black v.

1  Stephens, 662 F.2d 181, 185 (3d Cir.1981), cert. denied sub nom. Stephens v. Black, 455 U.S. 1008, 102 S.Ct. 1646, 71
   L.Ed.2d 876 (1982), reh'g denied by 456 U.S. 950, 102 S.Ct. 2022, 72 L.Ed.2d 475 (1982).

2  **§ 1-3.68  Force, Drawing Weapons May Violate Fourth Amendment**
           **As a general principle, pointing a gun to the head of an apparently unarmed suspect during an**
3  **investigation can be a violation of the Fourth Amendment, especially when the individual poses no particular**
   **danger.**

4
   **AUTHORITY**
5          Robinson v. Solano County, 278 F.3d 1007, 1015 (9th Cir.2002)(en banc); see, e.g., United States v. Del Vizo,
   918 F.2d 821, 825 (9th Cir.1990).

6  **§ 1-3.68.1  Force, Use Of Weapon Against Helpless Person Is Excessive Force**
           **Use of a weapon against someone who is helpless constitutes excessive force.**
7
   **AUTHORITY**
8          Motley v. Parks, 383 F.3d 10589 (9th Cir.2004)(citing Headwaters Forest Defense v. County of Humboldt, 276
   F.3d 1125, 1130 (9th Cir.), *cert. denied*, 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002)).

9  **§ 1-3.68.2  Force, Pointing Gun At Person's Head Can Be Excessive Force**

10         **Pointing a gun at a person's head can constitute excessive force.**

11  **AUTHORITY**
           Motley v. Parks, 383 F.3d 1058 (9th Cir.2004)(citing Headwaters Forest Defense v. County of Humboldt, 276
12  F.3d 1125, 1130 (9th Cir.), *cert. denied*, 537 U.S. 1000, 123 S.Ct. 513, 154 L.Ed.2d 394 (2002)).

   **§ 1-3.71  Force, Pushes And Shoves Give Rise To Liability**
13
           **Police officers do not have the right to shove, push, or otherwise assault innocent persons without any**
14  **provocation.**

15  **AUTHORITY**
           **Jacobs v. City of Chicago, 215 F.3d 758, 774 (7th Cir. 2000); Clash v. Beatty, 77 F.3d 1045, 1048 (7th**
16  **Cir.1996); McDonald v. Haskins, 966 F.2d 292 (7th Cir.1992); Lanigan v. Village of East Hazel Crest, Ill., 110**
   **F.3d 467, 475 (7th Cir.1997).**

17  **§ 1-3.71.2  Force, Use Of Excessive Force During Searches Renders Searches Unreasonable**

18         **It clearly is recognized that the use of excessive force during a search makes that search unreasonable**
   **under the Fourth Amendment.**
19
   **AUTHORITY**
20         **Boyd v. Benton County, 374 F.3d 773, 780 (9th Cir.2004)(citing Chuman v. Wright, 76 F.3d 292, 293**
   **(9th Cir.1996)).**

21  **§ 1-3.72  Force, Handcuffing Too Tightly Is Violation**

22         **Excessive force claims can be based on handcuffing an individual's wrists too tightly.**

23  **AUTHORITY**
           **Kostrzewa v. City of Troy, 247 F.3d 633, 639 (6th Cir. 2001); Martin v. Heideman, 106 F.3d 1308, 1312**
24  **(6th Cir.1997); Walton v. City of Southfield, 995 F.2d 1331, 1342 (6th Cir.1993).**

   **§ 1-3.72.1  Force, Overly Tight Handcuffing Constitutes Excessive Force**
           **It is well-established that overly tight handcuffing can constitute excessive force.**
25  **AUTHORITY**
26         **Wall v. County of Orange, 364 F.3d 1107, 1112 (9th Cir. 2004).**

   **§ 1-3.73  Force, Handcuffing Too Tightly, Driving Recklessly To Cause More Pain**
27

28

   Complaint                                                                              Page 17 of 23

1    **If police who have a person handcuffed and in a vehicle drive so recklessly so as to cause that person further pain and injury, this, by itself, is enough to state a claim upon which a reasonable factfinder could**
2    **conclude that the officers used excessive.**

3    **AUTHORITY**
        **Kostrzewa v. City of Troy, 247 F.3d 633, 640 (6th Cir. 2001).**
4    **§ 1-3.74 Force, Handcuffing**
        **Officers use excessive force on a plaintiff by unreasonably injuring a wrist as they handcuff.**
5
     **AUTHORITY**
6        **Hansen v. Black, 885 F.2d 642, 645 (9th Cir.1989).**
     **§ 1-3.88 Unprovoked Force Excessive**
7
        **Police officers do not have the right to shove, push, or otherwise assault innocent citizens without any**
8    **provocation whatsoever.**

9    **AUTHORITY**
        **Clash v. Beatty, 77 F.3d 1045, 1048 (7th Cir.1996); Lanigan v. Village of East Hazel Crest, Ill., 110 F.3d 467,**
10   **475 (7th Cir.1997); see also, McDonald v. Haskins, 966 F.2d 292 (7th Cir.1992).**
     **§ 1-3.89  Excessive Force Unlawful, Police On Notice**
11
        **All government officials are on notice that it is unlawful to use excessive force against citizens.**
12
     **AUTHORITY**
13   **P.B. v. Koch, 96 F.3d 1298, 1304 (9th Cir.1996).**
     § 1-3.95 Force, Deadly, When Hold Gun And Threaten To Shoot
14
        Holding a gun to a person and threatening to pull the trigger is a use of deadly force.
15
     AUTHORITY
16       Jacobs v. City of Chicago, 215 F.3d 758, 774 (7th Cir. 2000).
     § 1-2.1.5 Privacy, Right to
17
        The Fourth Amendment generally proscribes unreasonable intrusions on one's bodily integrity and other
18   harassing and abusive behavior that rises to the level of an unreasonable seizure.

19   AUTHORITY
        Fontana v. Haskin, 262 F.3d 871, 878-79 (9th Cir. 2001)(citing Headwaters Forest Def. v. County of Humboldt,
20   240 F.3d 1185, 1199 (9th Cir. 2000)).
     § 1-2.3.1 Searches, Right To Be Free From Unreasonable Conduct
21       The Fourth Amendment operates as a limitation upon the exercise of government power, and it guarantees to
     inhabitants of the United States of America the absolute right to be free from unreasonable searches carried out by virtue
22   of government authority.

23   AUTHORITY
        Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics, 403 U.S. 388, 392, 91 S.Ct. 1999, 2002,
24   29 L.Ed.2d 619 (1971).

25

26
        6. About 9 seconds after we were stopped, Dykstra broke out the drivers window without ever
27
     identifying himself or asking Carry to exit the truck. It was about 1:24 seconds after we had stopped that
28

     Complaint                                                                    Page 18 of 23

1  Conley went to the passenger side and broke out that window all most killing Tina. Conley hit the
2  window so hard that the door needs to be replaced now. If Tina had not moved her head when she did,
3  you would not be getting this complaint now. Conley used an overhead swing when he hit the window.
4  And broke the window right by the passengers head. Which is against APD's operating procedures
5  manual(OPM).

6    7. Tina was getting out of the truck when Conley broke out the window. After Conley broke the
7  window, he had his gun in his left hand and shoved it into Tina's back with intent to kill her. Then
8  Conley proceeded to sexually assault Tina on the hood of Nelson's car. Nelson has made the video from
9  his car disappear. We know that Nelson's car has a video because Flack took pictures which show the
10  camera in Nelson's car. And Nelson also got up from beating on Carry and turned off his car lights so
11  that his camera would turn off. Conley sexually assaulted Tina by means the intentional touching, either
12  directly or through the clothing, of the genitalia, anus, groin, breast, inner thigh, or buttocks of any
13  person with an intent to abuse, humiliate, degrade, or arose or gratify the sexual desire of any person.
14  Conley was rubbing his privates on Tina's buttocks while he had her face slammed into the hood of
15  Nelson's car. Conley was steeling Tina's camera with the disk inside, and was trying to stop Tina from
16  answering her cell phone, and took her moose purse. Conley also tried to brake Tina's wrists while he
17  was steeling these things from Tina. There was NO search warrant. And Tina was latter told by Flack
18  that she was not under arrest. Which means that the property was stolen from her. Tina was placed into
19  tight handcuffs and put into the back seat of Flack's car without ever being given her Miranda rights.
20  Carry was never ever given his Miranda rights either. carry was put into to tight handcuffs which were
21  cutting into his wrists. One of the officers had his knee in Carry's chest trying to choke him to death.
22  These officers are on steroids. These officers are also keeping the videos from their cars instead of
23  placing them into evidence like they are suppose to. What is evidence doing in the hands of the officers
24  at their homes?

25    8. Samuel M. Flack shows up at the scene and takes over Tina. Flack is nuts!!!!!! look at the video.
26  Flack helps Tina over to his car where he is suppose to only do a Terry stop frisk. But, Flack goes
27  beyond that Terry stop frisk. By putting his hands under Tina's skirt and forcing her legs open at the
28  top where she was trying to stop Flack from going. He pulled on her legs and all most made her fall.

Complaint

1  And he went up one leg of Tina's and touched her pussy and down the other leg of Tina's. NO where
2  in the Terry case or other cases that talk about Terry stop frisks does it say that an officer has the right
3  to touch the pussy of a female. These two sexual assaults on Tina were done in order to get her to react
4  so that the officers could start hitting her to get Carry to react so the officers could shoot him and Tina.
5     9. There was also at least 5 searches of the truck without the owners consent. And the cops thrashed
6  the truck. See pictures and video. This was nothing more than a pretexual stop and retaliation.

7  § 1-1.117  Arrests, Pretextual

8        Where the arrest is only a sham or a front being used as an excuse for making a search, the arrest itself and
   the ensuing search are illegal.
9
   AUTHORITY
10       Taglavore v. U.S., 291 F.2d 262, 265 (9th Cir.1961).

11     Conley also pointed his gun at Carry again just before he pulled Tina out of the truck. Nelson and
12  Dykstra also pointed their guns at Tina and Carry. Conley putting his gun in the middle of Tina's back
13  as hard as he could is excessive force. There has to be a report written up by these cops every time they
14  pull their guns. Where is the reports????

15     10. By reason of defendant's conduct, plaintiff's were deprived of rights, privileges, and immunities
16  secured to them by the Fourth and Fourteenth Amendments to the Constitution of the united Stats by,
17  inter alia, (a) arresting plaintiffs without reasonable suspicion or probable cause; (b) subjecting plaintiffs
18  to an illegal search and seizure; (c) depriving plaintiffs of their constitutionally protected rights; (d)
19  submitting false and inaccurate police reports leading to the malicious prosecution of plaintiffs; and (e)
20  engaging in conduct of abuse of power and authority which shocks the conscience.

21     11. Carry has been maliciously prosecuted from the start. There was NO probable cause to arrest. And
22  under Alaska Criminal Rules 5.1 which referees to a preliminary examination hearing. Alaska courts
23  do not follow this rule. But the public sure has to follow these rules. The courts are ruches the
24  demandants to judgment when they don't let them have this very important hearing. And Alaska also
25  does not have probable cause hearings. Which MUST be done before any case can go before the grand
26  jury. And the cops perjured themselves a long with the prosecutor Sharon Marshall. She said that she
27  was required to produce exculpatory evidence to the grand jury yet she never ever produced this
28  evidence. Nor did she produce our video which shows that we were on the phone with 911 telling them

Complaint                                                                                    Page 20 of 23

1  that we are not eluding, we are going to a safe, open public place were we will talk. These cops don't
2  want people to go to a safe, open public place because then there will be witnesses to their illegal acts.
3  Carry asked for his preliminary examination hearing and was denied it. And the record does not show
4  that Carry ever gave up his right to this preliminary examination hearing.

5    12. Carry is being maliciously prosecuted because the cops have fabricated evidence. The Conley and
6  Nelson also said that they would get together later to make sure that their notes said the same thing.
7  Carry over heard this on his way into jail. Flack told Tina that Carry was only eluding. So, at what point
8  did all these other charges come from? These cops had NO probable cause for the stop in the first place.
9  It was ALL in retaliation. Carry was in fear for his life a long with the life of his wife. These cops
10  Operating Procedures Manuel says that officers presences in uniform is their first show of force. Conley
11  has said that is true on the record.

12    13.

13  5-1.2 Consent, Vitiation Of

14      The threatening presence of several officers, the display of a weapon by an officer, some physical touching of
    the person of a citizen by an officer, or the use of language or tone of voice indicating that compliance with the officer's
15  request might be compelled, all are circumstances which you should consider in determining whether a plaintiff
    consented to any conduct of an officer.
16
    AUTHORITY
17      United States v. Mendenhall, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980).
    § 5-1.4 Consent, Right To Refuse
18
        One's awareness of his or her right to refuse consent to police action is relevant to the issue of voluntariness
19      of alleged content.

20  AUTHORITY
        Lion Boulos v. Wilson, 834 F.2d 504, 508-09 (5th Cir.1987).
21  § 5-1.5 Consent, No Notice Of Freedom To Leave

22      The absence of such notice-that one being detained is free to leave-may imply that the detainee is being
    restrained.
23
    AUTHORITY
24      Buffkins v. Omaha, 922 F.2d 465, 469 (8th Cir.1990).
    § 5-1.6 Consent, Intimidation
25
        "Consent" that is the product of official intimidation or harassment is not consent at all. Citizens do not forfeit
26      their constitutional rights when they are coerced to comply with a request that they would prefer to refuse.

27  AUTHORITY
        Florida v. Bostick,, 501 U.S. 429, 437, 111 S.Ct. 2382, 2388, 115 L.Ed.2d 389 (1991).
28  § 5-1.8 Consent, Mental Coercion

    Complaint                                                                    Page 21 of 23

1
    Coercion can be mental as well as physical.

2

AUTHORITY
3
    Blackburn v. Alabama, 361 U.S. 199, 206, 80 S.Ct. 274, 279, 4 L.Ed.2d 242 (1960).
§ 5-1.9  Consent, Threats Vitiate

4
    Coercion need not depend upon actual violence. A credible threat is sufficient.

5

AUTHORITY
6
    Arizona v. Fulminante, 499 U.S. 279, 287, 111 S.Ct. 1246, 1253, 113 L.Ed.2d 302 (1991).
§ 5-1.13  Consent, Confessions

7
    To be admissible, a confession must be made freely and voluntarily; it must not be extracted by threats in
8
    violation of due process or obtained by compulsion or inducement of any sort.

9  AUTHORITY
    Griffin v. Strong, 983 F.2d 1540, 1542 (10th Cir.1993); Haynes v. Washington, 373 U.S. 503, 513, 83 S.Ct.
10
    1336, 10 L.Ed. 2d 513 (1963).
§ 5-1.14  Consent, Notice Of Freedom To Leave

11
    An officer's failure to advise a citizen of his freedom to walk away is a significant indicator of what that
12
    citizen reasonably believed.

13  AUTHORITY
    Morgan v. Woessner, 975 F.2d 629, 636 (9th Cir.1992), withdrawn, 997 F.2d 1244 (9th Cir.1993); Florida
14
    v. Royer, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).
§ 5-1.15  Consent, Request To Go Elsewhere

15
    An officers' request that an individual accompany him to another location may tend to indicate that the
16
    individual reasonably believed that he was not free to walk away.

17  AUTHORITY
    Florida v. Royer, 460 U.S. 491, 503, 103 S.Ct. 1319, 1327, 75 L.Ed.2d 229 (1983); Morgan v. Woessner,
18
    975 F.2d 629 (9th Cir.1992), withdrawn, 997 F.2d 1244 (9th Cir.1993).
§ 5-1.16  Consent, Restraint On Freedom Of Movement

19
    A person is "seized" only when by means of physical force or a show of authority, his freedom of movement
20
    is restrained.

21  AUTHORITY
    United States v. Mendenhall, 446 U.S. 544, 553-54, 100 S.Ct. 1870, 1876-77, 64 L.Ed.2d 497 (1980).
22  § 5-1.17  Consent Must Be Consensual

23
    A consensual exchange between police and citizens cannot take place in the absence of consent.

24  AUTHORITY
    Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); Morgan v. Woessner,
25
    975 F.2d 629 (9th cir.1992), withdrawn, 997 F.2d 1244 (9th Cir.1993).
§ 5-1.18  Consent, None When Cooperation Refused

26
    When a citizen expresses his or her desire not to cooperate, continued questioning cannot be deemed
27
    consensual.

28  AUTHORITY

Complaint

1    Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); Morgan v. Woessner,
     975 F.2d 629 (9th cir.1992), withdrawn, 997 F.2d 1244 (9th Cir.1993).
2    § 5-1.19  Consent, Expressed Desire To Be Let Alone Vitiates

3          There is no case in which a court has found a police-citizen exchange to be consensual where the citizen
           unequivocally expressed his or her desire to be left alone.
4
     AUTHORITY
5          Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); Morgan v. Woessner,
           975 F.2d 629 (9th cir.1992), withdrawn, 997 F.2d 1244 (9th Cir.1993).
6    § 5-1.20  Consent, No Compelled Cooperation

7          Insistence that one answer police questions may indicate to one that his or her cooperation is compelled.

8    AUTHORITY
           Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); Morgan v. Woessner,
9          975 F.2d 629 (9th cir.1992), withdrawn, 997 F.2d 1244 (9th Cir.1993).
     § 5-1.21  Consent, Refusal To Listen To Or Answer Police
10
           A citizen may not be detained even momentarily without reasonable, objective grounds for doing so; and his
11         refusal to listen or answer does not, without more, furnish those grounds.

12   AUTHORITY
           Florida v. Royer, 460 U.S. 491, 498, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983); Morgan v. Woessner,
13         975 F.2d 629 (9th cir.1992), withdrawn, 997 F.2d 1244 (9th Cir.1993).
     § 5-1.22  Consent, Based On Freedom To Leave
14
           The essential inquiry is whether the person stopped reasonably believed that he or she was not free to leave.
15
     AUTHORITY
16         United States v. Patino, 649 F.2d 724, 726-27 (9th Cir.1981).

17
           This is made to preserve our rights to file before the statute of limits runs out and to give
18
     fair notice to defendants.  We will need to ammend this in the future to conform to the rules of
19
     court and to make any corrections and additions as needed.
20
           Dated this 26th day of September 2007.
21

22

23
                                    Under protest UCC 1-308 all liberies reserved
24

25

26

27

28

     Complaint                                                                    Page 23 of 23